**In the Interest of J.M., Minor Child,**

**J.M., Minor Child, Appellant.**

No. 12–1963.

Court of Appeals of Iowa.

March 27, 2013.

Dana L. Copell, Davenport, for appellant.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Michael Walton, County Attorney, and Julie Walton, Assistant County Attorney, for appellee.

Timothy Tupper, Davenport, for mother.

Jack E. Dusthimer, Davenport, for amicus curiae.

Considered by VAITHESWARAN, P.J., and TABOR and MULLINS, JJ.

MULLINS, J.

The child's guardian ad litem (GAL) appeals from a modification and permanency review order changing the child's level of care from foster family care in Iowa to relative care in Mexico. The GAL contends the juvenile court erred in (1) refusing to grant a continuance, (2) refusing to grant a motion for a child therapist to examine the child, (3) refusing to grant a request for a neutral translator, (4) refusing to hold a hearing on whether the Department of Human Services (DHS) prevented the GAL from performing her duties, (5) modifying the level of care in the absence of any substantial and material change in circumstances, (6) admitting a home study performed in Mexico into evidence, and (7) modifying the level of care in the absence of any showing it would further the child's best interests. We find the juvenile court was without subject matter jurisdiction to adjudicate the child as a child in need of assistance. Accordingly, we vacate in part, reverse in part, and remand.

## I. Background Facts & Proceedings

J.M. was born in Texas on August 3, 2010. J.M.'s mother is a citizen of Mexico who came to the United States at the age of sixteen. J.M.'s father lives in Texas and is married to another woman. The father was aware of J.M.'s birth, but until these proceedings, his wife was not. J.M.'s mother and father did not maintain a relationship after J.M.'s birth but did communicate about issues relating to J.M. The mother has three other children from a previous relationship who are not at issue in the present appeal.

From August 3, 2010, through an unspecified date in February 2011, J.M. lived in Texas with the mother and three siblings. In February 2011, the mother returned to Mexico because, as she later explained, her grandmother was ill. In May 2011, the mother returned to Texas.

At some point between May 2011 and July 2011, the mother asked J.M.'s paternal aunt in Texas to watch her three older children. The mother indicated she was leaving with J.M. and another woman to look for employment. Although J.M.'s paternal aunt was not related to the three children, she agreed to watch them. The mother, J.M., and the other woman then boarded a bus for Iowa.

On July 26, 2011, police officers executed a search warrant at a hotel room in eastern Iowa where the mother and J.M. were staying. Police officers found the mother in possession of over six ounces of methamphetamine. Officers arrested the mother, removed J.M. from her care, and placed J.M. into foster family care. The mother remained in custody on state and federal charges with a hold from the U.S.

Immigration and Customs Enforcement for the remainder of these proceedings because of her illegal immigration status.[1]

The next day the juvenile court entered an ex parte removal order and temporarily placed J.M. with DHS for foster family care placement. After outlining the circumstances leading to J.M.'s removal, the court found "The father is also a known drug dealer and may not be appropriate to assume care of the child."

Later that day a DHS worker interviewed the mother at the Scott County jail with the assistance of an interpreter. According to the DHS report, the mother stated she "did not have a current residence when she left for Iowa." The mother explained that before coming to Iowa she "was staying at hotels with [J.M.] and her other children." She also indicated she "was unemployed when she came to Iowa", and had "been supporting herself by receiving food and medical assistance, and receiving child support from [J.M.'s father]." The mother asserted that the father was a good father, was involved with J.M., and financially assisted her in caring for J.M. After the interview, DHS was able to obtain the father's date of birth and last known address in Texas. An initial criminal history search for the father revealed no criminal history in Iowa or Illinois.

On July 28, 2011, the State petitioned to adjudicate J.M. as a child in need of assistance (CINA). The petition asserted the juvenile court had jurisdiction to make a child custody determination because Iowa was "the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding." In the alternative, the State asserted the juvenile court had jurisdiction because "[t]he child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child … is subjected to or threatened with mistreatment or abuse."

To support a jurisdictional basis for the CINA petition, the State attached a standard jurisdictional affidavit from the DHS worker who interviewed the mother at the Scott County jail. Although the child had never lived with the father, the affiant listed the child's address as the father's last known address in Texas. In response to the jurisdictional form's request to list "[t]he places where the child has lived within the last five years and the names and present addresses of person who have lived with the child during this period", the affiant listed the mother's name and did not include an address. In response to an inquiry about whether DHS had "information of any custody proceedings concerning the child pending in an Iowa state court or any other state court", the affiant stated "No". The affiant further indicated DHS knew of no other "persons (sic) not a party to the proceeding who has physical custody of the child or claims to have custody or visitation with the child."

Soon after petitioning for adjudication, a DHS worker made contact with J.M.'s paternal aunt. The aunt expressed a desire to be considered as a placement option for J.M. She indicated that the father's wife did not know he had fathered J.M. She denied that the mother or the father had any history using or selling drugs. DHS then made contact with J.M.'s father. The father expressed a desire to have J.M. placed in his care. He denied any history of illegal drug use.

1. The mother denied any methamphetamine use. A subsequent hair stat test on J.M. was negative for the presence of any drugs.

In August 2011, the juvenile court held an uncontested removal hearing. The court asserted that it had jurisdiction over the parties and the subject matter. The court then ordered J.M. to continue to be placed with DHS for foster family placement.

In September 2011, the juvenile court held an uncontested adjudication hearing. The court found it "has jurisdiction of the parties and of the subject matter. The mother appeared, submitting to the jurisdiction of the Court.... The father has submitted to jurisdiction of the Court by submission of an Application for Appointment of Counsel." The court then adjudicated J.M. as a child in need of assistance. Afterwards, DHS initiated procedures to request an Interstate Compact on the Placement of Children (ICPC) home study for the purpose of placing J.M. with relatives in Texas.

In October 2011, the juvenile court held an uncontested dispositional hearing. The court asserted that it "has jurisdiction of the parties and of the subject matter."

Later that month the Texas Department of Family and Protective Services (Texas FPS) closed Iowa's home study request. The father used his sister's address in Texas for the home study. The Texas FPS explained that they closed the home study because the father failed to return identification and social security cards for his sister and her husband. The father indicated he would attempt a home study at his address. If he did not pass this home study, he listed his mother and father in Mexico as an alternate placement option.

In November 2011, the mother was indicted on federal charges. She was transported to a jail in Illinois pending the outcome of her case. After learning that the father's home study had been denied, the mother requested home studies on her brother and her cousin, Sandra, in Mexico. Sandra contacted DHS about J.M. and provided sufficient information for DHS to contact the Mexican Consulate to request a home study.

In February 2012, the court held on uncontested review hearing. The court found it "has jurisdiction of the parties and of the subject matter." The court noted that a second ICPC request had been made in an attempt to place J.M. with the father. At that time, the Mexican Consulate had not responded to many calls to facilitate placement with relatives in Mexico. The court noted that DHS "is going to change the child's foster home to a foster-to-adoption home in the near future as a concurrent plan. Meanwhile [DHS] shall diligently pursue possible placement of [J.M.] with his father or relatives in Mexico." The court found that it was "disconcerting that the child's father has not followed through with ICPC and has not even visited his young son since his placement. No explanation for his lack of contact, other than distance, was given."

In late February 2012, DHS made contact with the Mexican Consulate. The Mexican Consulate approved home studies for J.M.'s paternal grandmother and the mother's cousin, Sandra. After considering the wishes of both parents and J.M.'s best interests, DHS decided to request the court's permission to place J.M. with Sandra and her husband in Mexico.

In March 2012, the Texas FPS closed a second home study request for placement with the father. This request was denied because the father indicated he was moving into his sister's home. Texas FPS indicated they could not perform a home study in a home where the father did not yet reside. The agency requested Iowa resubmit a home study request with the current address after the father moved.

DHS declined to pursue another home study for placement with the father.

In June 2012, the juvenile court held a contested permanency hearing. The court took the matter under advisement and did not issue a decision at that time.

After the permanency hearing, the GAL filed a petition to terminate the mother's and the father's parental rights. In explaining the urgency of termination, the GAL argued, in part, "If [termination of parental rights] is not ordered, the father could simply go get the child and may be able to initiate custody proceedings in Texas." Termination of parental rights proceedings were set to begin in September 2012, but were re-set for December 2012.

On October 3, 2012, the State filed a motion to modify the dispositional order.[2] The State sought to change the level of J.M.'s care from foster family care to relative placement with the intent of placing J.M. with Sandra and her husband in Mexico. The State's motion indicated Sandra would be in Iowa from October 2 through October 9, 2012, and requested the court set a hearing to determine whether the requested placement was in J.M.'s best interests. The motion asserted "Notice to the parties is the earliest notice possible given the geographical constraints inherent in this case." The juvenile court set a hearing for October 8, 2012. Between October 2 and October 9, 2012, Sandra exercised supervised visits with J.M.

Just hours before the October 8, 2012 hearing, the GAL filed a response to the State's motion and moved for a continuance. The GAL indicated that the one hour scheduled for the hearing on the State's motion to modify was insufficient to address J.M.'s best interests. The GAL asserted she was not given access to observe Sandra's interactions with J.M., and requested time to determine whether DHS had interfered with the GAL's role. The GAL also requested a neutral interpreter and a child therapist to address the possibilities of an attachment disorder inherent in removing a young child from a closely-bonded foster family and placing the child in a foreign country.

The juvenile court denied the GAL's motion for a continuance and proceeded with the hearing on the State's motion to modify disposition. The State presented testimony from Sandra. She reported that she was a U.S. citizen born in Illinois. She asserted that she is a human rights attorney in Mexico and her husband is an attorney for an agency similar to DHS. She indicated they had already adopted one child in Mexico, and reported the adoption procedures were similar to those utilized in the United States. She arranged for a bilingual day care and a bilingual private school for J.M. pending the outcome of the proceedings.

On October 10, 2012, the juvenile court issued a written decision on the June 2012 permanency hearing. The court outlined its jurisdictional basis as follows:

> The Court has jurisdiction of the parties and of the subject matter. The child lived in several different jurisdictions, a few months in Mexico and the remaining months in Texas, in the six months prior to his arrival in Iowa. His only connection to Iowa was his and his mother's presence in the State at the time of removal. He was removed from his mother's custody by law enforcement officers as they arrested her for a federal drug delivery charge. No other jurisdiction has asserted its primacy over the

---

**2.** The State filed a previous motion on October 2, 2012, requesting the court set a hearing for October 5, 2012. Although the court set a hearing for October 5, 2012, the State filed the subsequent October 3, 2012 motion after learning of a scheduling conflict.

parties or the subject matter. No party to this action has disputed Iowa's jurisdiction at any hearing, including this hearing.

The court confirmed J.M.'s adjudication as a child in need of assistance. The court then concluded it "could not find that termination wouldn't be in the best interests of [J.M.]"

On October 18, 2012, the juvenile court resumed the hearing on the State's motion to modify disposition. The GAL presented testimony from J.M.'s daycare provider and J.M.'s foster family care parent. At the conclusion of all the evidence, the GAL resisted modifying the prior dispositional order changing the level of care. The mother, the father, and DHS supported placing the child with Sandra and her husband in Mexico.

On November 1, 2012, the juvenile court ordered that the permanency order entered on October 10, 2012, be modified. The court placed J.M. with Sandra and her husband in Mexico under the supervision of DHS. The juvenile court granted the GAL's request for an emergency stay preventing the child from leaving the country, and the GAL filed an appeal.

On appeal, this court sua sponte raised the issue of whether the juvenile court had subject matter jurisdiction to adjudicate the child as a child in need of assistance pursuant to the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA). *See* Iowa Code ch. 598B (2011). We will develop additional facts and circumstances as necessary.

## II. Standard of Review

■ We review jurisdictional issues under the UCCJEA de novo. *See In re Guardianship of Deal–Burch*, 759 N.W.2d 341, 343 (Iowa Ct.App.2008).

## III. Subject Matter Jurisdiction

■ To determine whether the juvenile court erred in modifying the dispositional order, we must first address the question of whether the juvenile court had subject matter jurisdiction to enter the child in need of assistance and dispositional orders. The UCCJEA sets forth statutory requirements to establish jurisdiction over a child custody determination. *See* Iowa Code ch. 598B. Whether a case satisfies those statutory requirements raises a question of subject matter jurisdiction.[3] *See In re Jorgensen*, 627 N.W.2d 550, 554 (Iowa 2001) (analyzing former Iowa Code chapter 598A, the Uniform Child Custody Jurisdiction Act (UCCJA), predecessor to the UCCJEA). Neither the parties nor the court may waive the issue of subject matter jurisdiction by consent or through failure to address or prove jurisdiction. *See id.* Only the constitution or a statute may confer subject matter jurisdiction. *See Klinge*, 725 N.W.2d at 15. The parties, or the court, may raise a question of subject matter jurisdiction at any time. *See Jorgensen*, 627 N.W.2d at 554. On appeal, we may, and should, examine the grounds for subject matter jurisdiction even though the parties have not. *See id.* at 555. If the juvenile court lacks subject matter jurisdiction, we must dismiss. *See id.*

The UCCJEA section 598B.201(1) provides "the exclusive jurisdictional basis for

**3.** "Subject matter jurisdiction is the court's power to hear and determine cases of the general class to which the proceedings in question belong, not merely the particular case then occupying the court's attention."

*Klinge v. Bentien*, 725 N.W.2d 13, 15 (Iowa 2006) (discussing the difference between subject matter jurisdiction and the court's authority to hear a particular case).

making a child-custody determination." Iowa Code § 598B.201(2). Section 598B.201(1) provides:

1. Except as otherwise provided in section 598B.204, a court of this state has jurisdiction to make an initial child-custody determination only if any of the following applies:

a. This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

b. A court of another state does not have jurisdiction under paragraph "a", or a court of the home state of the child has declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under section 598B.207 or 598B.208 and both of the following apply:

(1) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

(2) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

c. All courts having jurisdiction under paragraph "a" or "b" have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under section 598B.207 or 598B.208.

d. No court of any other state would have jurisdiction under the criteria specified in paragraph "a", "b", or "c".

To analyze whether the juvenile court had subject matter jurisdiction under chapter 598B, we must first consider the provisions under section 598B.204. *See* Iowa Code § 598B.201(1) ("Except as otherwise provided in section 598B.204 . . . .").

### 1. Temporary Emergency Jurisdiction

■ Section 598B.204 provides for temporary emergency jurisdiction under certain circumstances. An Iowa court "has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." § 598B.204(1). In this case, J.M. was removed from his mother's custody while she was temporarily in the state for the apparent purpose of trafficking narcotics. At the time of removal, the court could not identify an appropriate care provider while the mother was in jail. Under these circumstances, we find the juvenile court had temporary emergency jurisdiction to enter the temporary removal order. *See id.; In re E.D.*, 812 N.W.2d 712, 716–17 (Iowa Ct.App. 2012).

■ A custody determination made under the court's temporary emergency jurisdiction is a temporary order. *See* Uniform Child Custody Jurisdiction and Enforcement Act (1997) § 204 cmt. (setting forth the official comments to the temporary emergency jurisdiction section of the UCCJEA). A court cannot premise a subsequent child in need of assistance adjudication and dispositional order on section 598B.204(1) alone.[4] *See E.D.*, 812 N.W.2d at 718.

**4.** *See* Part III.6 (recognizing that even when Iowa is not the child's home state, a tempo-

### 2. Home State Jurisdiction

Except as provided under the temporary emergency jurisdiction provisions, a court has jurisdiction to make an initial child custody determination if "[t]his state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding." *See* Iowa Code § 598B.201(1)(a). "Home state" is defined as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." *Id.* § 598B.102(7).

■ In the State's CINA petition, it asserted Iowa was J.M.'s home state, or in the alternative the court had temporary emergency jurisdiction. It was the State's burden to make a prima facie showing of jurisdiction. *See Addison Ins. Co. v. Knight*, 734 N.W.2d 473, 476 (Iowa 2007); *see also* Iowa Code § 598B.209. At the commencement of the CINA proceeding and throughout the proceeding, the evidence clearly shows that the State did not meet its burden to show that the child had lived in Iowa for at least six consecutive months. We find that Iowa was not J.M.'s home state. *See* Iowa Code § 598B.102(7). As previously articulated, the court cannot predicate a final child custody determination on temporary emergency jurisdiction alone. *See E.D.*, 812 N.W.2d at 718.

As Iowa was not J.M.'s home state, we must consider whether another state was the child's home state, "or was the home state of the child within six months before the commencement of the proceeding and

rary child custody order may become a final child custody determination under section 598B.204(2) and (3)).

**5.** We note the Texas version of this provision of the UCCJEA is substantially the same as

the child is absent from this state but a parent or person acting as a parent continues to live in this state." *See* Iowa Code § 598B.201(1). For purposes of the home state analysis, periods of "temporary absence" do not count as part of the six month calculation. *See id.* § 598B.102(7).

■ J.M. was born in Texas. He lived in Texas from August 3, 2010, through an unspecified date in February 2011. From February 2011 through May 2011, the mother was in Mexico. The mother later explained that she was in Mexico because her grandmother was ill. In May 2011, she returned to Texas. Although she boarded a bus for Iowa, she had asked J.M.'s paternal aunt to watch three of her children while she looked for employment—evidencing a clear intent to return to Texas. At the time the State commenced the child custody proceedings in July 2011, neither the State nor the juvenile court knew what day in February the mother left Texas for Mexico and whether or not the mother's intent was to reside in Mexico. Thus, we cannot determine whether the mother lived in Texas for the requisite six months—August 3, 2010 through February 3, 2011—not counting a period of temporary absence from Texas and are unable to make a home state determination. *See id.* §§ 598B.201(1)(a), .102(7).

### 3. "Significant Connection" Jurisdiction

We now turn our analysis to section 598B.201(1)(b) to determine whether Iowa or Texas has jurisdiction. Pursuant to section 598B.201(1)(b),[5] a court has initial child-custody jurisdiction, if

Iowa's version. Accordingly, we will only cite the Iowa statute in this analysis. *See* Tex. Fam.Code Ann. § 152.201.

(b) A court of another state does not have jurisdiction under paragraph "a", or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under section 598B.207 or 598B.208 and both of the following apply:

(1) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

(2) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

 At the time the State commenced the initial child custody proceedings in July 2011 in the Iowa juvenile court, the mother had no connection to Iowa other than her temporary presence. We find neither the mother nor the child had a significant connection with this state other than their mere physical, temporary presence. Thus, Iowa did not have significant connection jurisdiction. *See id.* § 598B.201 (1)(b)(1). Further, substantial evidence concerning the child's care, protection, training, and personal relationships was not available in Iowa. *See id.* § 598B.201 (1)(b)(2).

 On the other hand, at the time these proceedings commenced, the father lived in Texas. The mother had lived in Texas for the past four years and was only temporarily in Iowa for the apparent purpose of distributing narcotics. The mother's three other children, J.M.'s half-siblings, continued to live in Texas. J.M. was born in Texas and for the majority of his life had lived in Texas—notwithstanding the absence from February through May of 2011. Upon our de novo review, we find J.M., the mother, and the father all had a significant connection with Texas. *See id.*

§ 598B.201 (1)(b)(1). Substantial evidence of J.M.'s care, protection, training, and personal relationships was also available in Texas. *See id.* § 598B.201(1)(b)(2). Thus, we find Texas, and not Iowa, had jurisdiction under section 598B.201 (1)(b).

### 4. Jurisdiction Under Section 598B.207 or .208

 The State and the GAL argue Iowa communicated with Texas and Texas declined jurisdiction. Under section 598B.201 (1)(a) and (b), a court having either home state or significant connection jurisdiction may decline to exercise jurisdiction because another state is a more convenient forum or party seeking to invoke its jurisdiction engaged in unjustifiable conduct. *See id.* §§ 598B.201 (1)(a), (b), .207, .208. Iowa DHS contacted Texas FPS to arrange for home studies on J.M.'s relatives living in Texas. Part of the reason the home studies were denied is because Iowa did not have access to the type of information about the relatives that would have been available to agencies in Texas. Although DHS communicated with Texas FPS, this is not a substitute for a Texas judicial determination that it has declined to exercise jurisdiction or that Iowa is a more appropriate forum under the factors set forth in section 598B.207 or 598.208. *See id.* Thus, Iowa did not have subject matter jurisdiction under section 598B.201(1)(c).

### 5. Default Jurisdiction

The State and the GAL argue Iowa had jurisdiction pursuant to Iowa Code section 598B.201(1)(d). Under section 598B.201(1)(d), a court of this state has jurisdiction to enter an initial child custody determination if no other state has jurisdiction under subparagraphs "a", "b", or "c" under section 598B.201(1). As we find Texas had jurisdiction under section

598B.201(1)(b), the Iowa juvenile court did not have jurisdiction by default.

### 6. Jurisdiction under Iowa Code section 598B.204(2)

We recognize that even when Iowa is not the child's home state, a temporary child custody order may become a final child custody determination. *See* Iowa Code § 598B.204(2), (3). Pursuant to section 598B.204(2), "If a child-custody proceeding has not been or is not commenced in a court of a state having jurisdiction under sections 598B.201 through 598B.203, a child-custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child." Upon our de novo review of the juvenile court's adjudication and subsequent dispositional orders, the juvenile court did not so provide. *See E.D.*, 812 N.W.2d at 721–22.

## IV. Conclusion

■ Juvenile courts have an obligation to determine the existence of subject matter jurisdiction. *See State v. Lasley*, 705 N.W.2d 481, 485–86 (Iowa 2005). It is well-settled that "when a court is confronted with a question of its own authority to proceed, it should take charge of the proceedings affirmatively, regardless of the vehicle used to raise the issue." *Id.* (citations omitted). To assist the court in its subject matter jurisdiction analysis in a child-custody proceeding, each party has an obligation to submit a jurisdictional affidavit in its first pleading. Iowa Code § 598B.209(1). If a party fails to present the jurisdictional information, "the court, upon motion of a party or its own motion,

may stay the proceedings until the information is furnished." *Id.* § 598B.209(2). Here, only the State presented such an affidavit. The bare assertions in that affidavit were insufficient to establish jurisdiction in this case.

■ If a court is uncertain as to whether the facts support a finding of subject matter jurisdiction, the best practice is to stay proceedings until all parties submit jurisdictional affidavits or, in an appropriate case, communicate with a court having jurisdiction under section 598B.201. *See E.D.*, 812 N.W.2d at 719–21. Unfortunately that did not happen in this case. As we find the juvenile court was without subject matter jurisdiction to enter the adjudication and subsequent dispositional orders, we must reverse and remand for an order dismissing both the child-in-need-of-assistance petition and the petition to terminate parental rights. *See E.D.*, 812 N.W.2d at 722; *Jorgensen*, 627 N.W.2d at 555. We vacate the order adjudicating the child as a CINA and vacate all subsequent dispositional orders.

This ruling does not affect the authority of the juvenile court to continue to exercise its temporary emergency jurisdiction pursuant to section 598B.204 for a reasonable time.

**VACATED IN PART, REVERSED IN PART, AND REMANDED.**